Roberta D. Liebenberg (PA Bar No. 31838)
Girard A. Dever (PA Bar No. 85291)
Ria C. Momblanco (PA Bar No. 201818)
**FINE, KAPLAN AND BLACK, RPC**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Telephone: (215) 567-6565
Facsimile:  (215) 568-5872
rliebenberg@finekaplan.com
gdever@finekaplan.com
rmomblanco@finekaplan.com

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| KAAHUAKAMEHUANUI BRUN, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| JUUL LABS, INC., | |
| Defendant. | |

Plaintiff Kaahuakamehuanui Brun, individually and on behalf of all others similarly situated, files this complaint against Defendant JUUL Labs, Inc. and allege as follows:

## NATURE OF THE ACTION

1.      JUUL's e-cigarettes and nicotine delivery pods are highly addictive; they contain much higher levels of nicotine than cigarettes.  Since they came on the U.S. market in 2015, these products have led to increased levels of nicotine use and addiction among minors, causing a public health crisis. JUUL controls most of the $3 billion e-cigarette market after having dramatically expanded it, mostly at the expense of adolescent non-smokers.  JUUL adopted the tobacco industry's traditional strategies in marketing these products as glamorous, using images of "coolness" and candy flavors to hook teens on nicotine and chemical manipulation to ensure a smooth delivery.  JUUL further targeted the youth market by advertising on social media platforms and accepting nicotine pod subscription orders on its website.

2.      JUUL falsely marketed its pods as containing 5% nicotine salt per pod—the equivalent of a single pack of cigarettes.  In fact, each pod contains an even greater concentration of nicotine: at least 6.2%.  JUUL failed to disclose in its advertising any of the serious health problems likely to result from using its products, such as long-term nicotine addiction; increased risk of cancer, heart disease and stroke; decreased endocrine and reproductive functioning; severe lung ailments; and brain chemistry changes causing increased susceptibility to anxiety, depression, and other addictions.  According to one of the engineers who invented the JUUL e-cigarette, "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."

3.      Although JUUL markets its products as smoking cessation devices, they have not received FDA approval as modified risk tobacco products or as a nicotine replacement therapy.  Nor has the JUUL e-cigarette been subject to any FDA approval process.  Contrary to its pervasive marketing messaging, JUUL's products exacerbate rather than alleviate nicotine addiction.  And JUUL continues to hide the true facts about its products' nicotine content and propensity to induce addiction.  JUUL's deceptive marketing ensnared tens of thousands of people, causing or worsening dangerous nicotine addictions.  Plaintiff was injured by JUUL's common course of deceptive conduct and seeks relief on behalf of this class.

1

CLASS ACTION COMPLAINT
CASE NO.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) JUUL, Plaintiff Brun, and other class members are citizens of different states.

5.      Venue in this Court is proper under 28 U.S.C. § 1391 because JUUL is headquartered and regularly transacts and solicits business in this District.

## INTRADISTRICT ASSIGNMENT

6.      Assignment to the San Francisco Division is appropriate under Local Rule 3-2(c) because JUUL is headquartered in San Francisco and a substantial part of the conduct at issue in this case occurred in the City and County of San Francisco.

## PARTIES

**A.      Plaintiff**

7.      Plaintiff Kaahuakamehuanui Brun is a citizen and resident of Makaweli, Hawaii.

**B.      Defendant**

8.      Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation with its principal place of business in San Francisco.  Until 2017, JUUL operated under the name PAX Labs, Inc.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Plaintiff Kaahuakamehuanui Brun

9.      Plaintiff Brun purchased his first JUUL e-cigarette vaping device in the early part of 2018 at a 7-Eleven in Makaweli, Hawaii.  Brun made the purchase in an attempt to quit smoking cigarettes.

10.      Before making that purchase, Brun saw JUUL advertisements and marketing materials in which JUUL portrayed its devices as a safer alternative to cigarettes and as a viable path to quitting smoking.  Brun saw, in particular, advertisements claiming that vaping JUUL's products results in less nicotine consumption than smoking traditional cigarettes, and that the nicotine in JUUL pods is "5% strength."  Similar claims were repeated to Brun by his circle of friends, many of whom had also purchased a JUUL e-cigarette vaping device.

CLASS ACTION COMPLAINT
CASE NO.

11.     Brun saw these advertising statements on a variety of social media websites, such as Instagram.  Brun viewed advertisements containing these and similar statements for several months before his 2018 JUUL purchase.

12.     Brun's decision to purchase a JUUL e-cigarette vaping device was materially influenced by these advertising claims that he saw.  Had Brun known that the advertising claims that he saw regarding JUUL products' safety and nicotine potency relative to traditional cigarettes were false, he would not have purchased a JUUL e-cigarette vaping device.

13.     Brun quickly noticed he had developed a powerful oral fixation as a result of vaping his JUUL device and had become addicted.

14.     Brun has developed medical issues as a result of vaping his JUUL device.  Brun's symptoms include shortness of breath, coughing, diarrhea, migraine headaches, and pain in his chest and the back of his shoulders.

15.     In November 2019, Brun sought medical treatment as a result of these medical issues.

16.     Brun continues to suffer from respiratory and other medical issues and is addicted to vaping his JUUL device.

## COMMON FACTUAL ALLEGATIONS

**A.     Drawing on Previous Tobacco Industry Strategies, JUUL and Its Corporate Predecessors Developed the JUUL e-Cigarette.**

17.     JUUL Labs, Inc. started out as Ploom, Inc. in 2007.  The company's founders, Adam Bowen and James Monsees, invented the Ploom, a cigarette-shaped device that worked in tandem with replacement pre-filled pods of ground tobacco.  After placing the pods within the device, users inhaled tobacco vapor—they "vaped"—using an electrical heating element.

18.     In 2014, Bowen, Monsees and others applied for a patent for the JUUL vaping device. This product, like the Ploom, consisted of a standalone e-cigarette device to be used in tandem with replacement cartridges containing a nicotine solution derived from tobacco.

19.     Around 2015, the company, now known as PAX Labs, announced the JUUL e-cigarette. PAX Labs raised nearly $50 million from Fidelity Investments and other investors to fund the manufacturing and marketing of JUUL e-cigarettes.

CLASS ACTION COMPLAINT
CASE NO.

20.    In 2017, PAX Labs, Inc. split into two entities: JUUL Labs, Inc., which retained the tobacco-related business, and PAX Labs, Inc., which retained a marijuana-related business.

21.    Bowen now serves as JUUL's Chief Technology Officer, and Monsees as its Chief Product Officer.

22.    In 2017, JUUL became the dominant e-cigarette company in the United States. Its revenues increased by 700% in 2017.

23.    Statements by JUUL's founders and employees demonstrate that JUUL set out to develop a highly addictive product to sell to a new group of non-smokers. Monsees described the cigarette as "the most successful consumer product of all time . . . . an amazing product" and added that because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."

24.    Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." Aiming to recreate the "ritual and elegance that smoking once exemplified," Monsees and Bowen set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."

25.    JUUL followed the tobacco industry's prior practices in developing and executing its business strategy. Monsees publicly admitted that JUUL studied tobacco industry documents, including board minutes, made public under the Master Settlement Agreement reached in 1998 among the tobacco industry, governmental officials, and injured smokers. As Monsees stated, "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

26.    JUUL scrutinized, among other historical materials, documents revealing how tobacco companies chemically manipulated nicotine content to maximize nicotine delivery and the addictive qualities of cigarettes. Monsees admitted that JUUL was "able to deduce what had happened historically in the tobacco industry."

27.    Similarly, JUUL used historical tobacco industry advertising as a model for JUUL's own

4

advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [Stanford University's research on the impact of cigarette advertising] had been quite useful to them."[1]

28.    The JUUL e-cigarette is about the size and shape of a pack of chewing gum. This thin, rectangular device contains an aluminum shell, a circuit board, a battery, a magnet (for the USB charger), an LED light, and a pressure sensor. Each replacement JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When the pressure sensor in the e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which converts the nicotine solution in the JUULpod into a vapor consisting primarily of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device indicates battery level and displays a "party mode" display of a rainbow of colors when the device is waved around.

29.    The physical design of the JUUL device and its accompanying nicotine pod determines the amount of vaporized nicotine emitted. JUUL can change that amount by changing the temperature, maximum puff duration, or airflow for the device, among other factors.

30.    The JUUL e-cigarette is engineered to promote overuse and addiction. The device lacks a manual or automatic "off" switch. Neither the pod itself nor the device's temperature or puff duration settings limits the amount of nicotine the device delivers with each puff to the highest amount of nicotine in a cigarette. Thus, in contrast to a traditional cigarette, which burns down and eventually is extinguished when smoked, the JUUL allows ceaseless nicotine consumption, limited only by the device's battery. The JUUL thereby promotes addiction even more than a cigarette.

31.    JUUL manufactures and distributes JUULpods containing nicotine liquid. JUUL exclusively sells its pods in four-packs, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12- to 17-year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% most recently vaped fruit medley, mango, cool mint, or crème brulee.

---

[1] Robert K. Jackler, M.D. *et al.*, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019).

CLASS ACTION COMPLAINT
CASE NO.

32.     As noted above, JUUL founder's stated objective was to create a "luxury" product for people who do not smoke that is as addictive as cigarettes.  Yet JUUL has also consistently marketed its products as an "alternative" to cigarettes, inducing people to buy and use those products on the belief that they are less addictive and less dangerous than cigarettes.  JUUL failed to disclose in its advertising that, (1) contrary to JUUL's affirmative representations, there is a higher concentration of nicotine per pod than in a pack of cigarettes, and that (2) even if the nicotine concentration were comparable, the unique way in which a JUUL vaporizer dispenses nicotine renders it more harmful and more addictive than cigarettes.

**1.     Like Cigarettes, the JUUL's Purpose is to Foster and Maintain Nicotine Addiction.**

33.     All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

    a.     Cigarettes and other forms of tobacco are addictive;

    b.     Nicotine is the drug in tobacco that causes addiction; and

    c.     The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

34.     Nicotine use creates addiction through the brain's "reward" pathway.  Nicotine is both a stimulant and a relaxant.  It affects the central nervous system, causes increases in blood pressure, pulse, and metabolic rate, constricts blood vessels of the heart and skin, and relaxes the muscles. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs.  Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects that the user experiences as a "buzz" associated with pleasure, stimulation, relaxation, and reduction of stress and anxiety.  These effects result from nicotine's release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.

35.     The neurological changes caused by nicotine use create addiction.  And once a brain becomes addicted to nicotine, the absence of nicotine causes an intense desire for nicotine, which, if not

CLASS ACTION COMPLAINT
CASE NO.

satisfied, results in withdrawal symptoms including irritability, restlessness, anxiety, depression, difficulty concentrating, disorientation, food cravings, headaches, sweating, insomnia, heart palpitations and tremors, and intense cravings for nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.

36. Despite being advertised as a safe alternative to smoking, JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users. Nicotine is a carcinogen and a toxic chemical that often leads to cardiovascular, reproductive, and immune suppression problems. Nicotine damages the heart, eyes, reproductive system, lungs, and kidneys. Additionally, because vaping introduces foreign substances into the lungs, prolonged use of vaping products produces lung ailments that include chronic obstructive pulmonary disease. Vaping also triggers immune responses associated with inflammatory lung diseases.

**2.     Young Adults Are More Likely to Become Addicted to Nicotine from Its Use.**

37. Nicotine use by adolescents alters and impairs their brain development and creates a propensity for nicotine addiction. Adolescents, whose brains are still developing, are more susceptible to become addicted to nicotine than adults.

38. Adolescent nicotine use causes substantial neural remodeling including those parts of the brain governed by dopamine or acetylcholine, which play central roles in reward functioning and cognitive function, including executive function mediated by the prefrontal cortex. In addition to impairing memory functions and attention span, adolescent nicotine use tends to decrease the pleasure experienced from sources other than nicotine. Brain changes from nicotine use create heightened impulsivity and increased sensitivity to other drugs as well.

**3.     JUUL Manipulated Its Nicotine Formulation to Make It Attractive to Young Adults and Even More Addictive Than Cigarettes.**

39. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." The cigarette industry has long known that "nicotine is the addicting agent in cigarettes" and that "nicotine satisfaction is the dominant desire" of nicotine addicts.

40.     Tobacco companies manipulated nicotine and its delivery systems to induce and maintain addiction in their customers.  R.J. Reynolds Tobacco Company developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke.  As detailed in an RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'." This kick was attributed to increased nicotine absorption associated with lower pH.

41.     JUUL specifically used RJR's research and conclusions to produce a similar nicotine kick to hook users and drive up the sales of JUUL e-cigarettes.  In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL described a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier to optimize addiction.

42.     In a 2015 interview with *Wired* magazine, Ari Atkins, a JUUL research and development engineer and one of the inventors of the JUUL device, stated that "[i]n the tobacco plant, there are these organic acids that naturally occur.  And they help stabilize the nicotine in such a way that makes it ..." He paused.  "I've got to choose the words carefully here: Appropriate for inhalation."

43.     Using benzoic acid, JUUL artificially lowered the pH levels of the nicotine in its pods to reduce the "throat hit" that users experience when vaping.  The reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which produces a smoother hit as it is not absorbed in the throat or upper respiratory tract. JUUL's e-liquid has a pH of under 6.0, meaning that JUULpods contain almost no freebase (i.e., non-salt form) nicotine.  This manipulated formulation results in a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[2]

44.     JUUL's creation of a product with low levels of harshness and minimal throat "hit" demonstrates JUUL's main objective was to recruit non-smokers.  Smokers are already tolerant of the throat hit; many even associate it with getting their nicotine fix.  Thus, creating a smoother nicotine

---

[2] Anna K. Duell *et al.*, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431–34 (2018).

CLASS ACTION COMPLAINT
CASE NO.

delivery in e-cigarettes is unnecessary to provide an alternative for adult smokers—but it is crucial to enticing a new generation of youth to try out e-cigarettes.

45.    JUUL's nicotine manipulation also serves to mask the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. Enough irritation to the throat will cause even the most compulsive smoker to wait before inhaling again. Eliminating this feedback mechanism means that nicotine cravings can be satisfied nonstop. As a result, JUUL users are highly prone to become highly addicted to nicotine.

46.    JUUL products contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems (ENDS) containing freebase nicotine. On a per-puff basis, JUUL devices deliver nicotine doses that are significantly higher than those delivered by combustible cigarettes. Because nicotine yield is correlated with tobacco consumption, a JUULpod with more nicotine than a cigarette produces higher rates of JUULpod consumption, generating more revenue for JUUL. JUUL's '895 patent indicates that a 4% benzoic acid concentration coupled with a 5% concentration of nicotine salts causes blood nicotine-levels approximately 30% higher than a Pall Mall cigarette. JUUL's own data also show that nicotine salt solutions increase heart rate more, and more quickly, than traditional cigarettes—a 50 beats per minute increase within two minutes for nicotine salt, as compared to a 40 beats per minute increase in two-and-one-half minutes for a Pall Mall cigarette.

47.    JUUL falsely informed *TechCrunch* that, at peak delivery, the JUUL device delivers approximately 25% less nicotine to the blood than a traditional cigarette.

48.    At all relevant times, JUUL has known of its products' higher potency and propensity to induce nicotine addiction, as compared to combustible cigarettes. At no time, however, has JUUL disclosed in its advertising that its products deliver an exceptionally potent dose of nicotine.

49.    JUUL's nicotine salts increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes. Consequently, the risks of nicotine addiction and abuse are higher with JUUL e-cigarettes than with traditional cigarettes. Rather than helping smokers quit, then, use of a JUUL device worsens their level of addiction to nicotine. And JUULpods are exceptionally addictive when used by those without prior exposure to nicotine. JUUL has never disclosed this fact.

**B.     JUUL Deceptively Marketed Its JUUL E-Cigarette as an Alternative to Cigarettes When It Is Even More Addictive.**

**1.     JUUL Falsely Represented That Each JUULpod Contains Only as Much Nicotine as a Pack of Cigarettes.**

50.     JUUL has consistently represented that a single JUULpod contains about as much nicotine as a pack of cigarettes. JUUL advertisements state that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." That statement is false and misleading. As JUUL knows, it is not merely the amount of nicotine, but also how efficiently the product delivers nicotine into the bloodstream, that determines the product's narcotic effect and tendency to induce addiction.

51.     Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarette (or 20 cigarettes), that implies 2 mg of nicotine per cigarette. JUUL's equivalency claim further assumes 10 puffs per cigarette (i.e., 200 puffs per pack), or 0.2 mg (200 µg) of nicotine per puff. Assuming an average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380 milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each JUULpod. Yet the average pack generally delivers only 5-7% (19-27 mg) of its nicotine content to the user. In line with this expectation, a study of thousands of smokers found smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4–27.8 mg per pack), or less than half of the amount of nicotine contained in a JUULpod (i.e., 2 mg per "cigarette" based on JUUL's stated concentration, or 200 µg per puff assuming 100% delivery). In short, people absorb a substantially higher amount of nicotine from a JUULpod than from smoking a pack of cigarettes.

52.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is misleading. While the amount of nicotine *contained* in a JUULpod may be around six times less than in a pack of cigarettes, users *consume* approximately twice as much nicotine via a JUULpod than via cigarettes.

53.     Further, while a pack of cigarettes contains 20 cigarettes, each of which must be separately lit, the JUUL can be inhaled continuously. Also, it often can be used indoors without detection by others—a feature that JUUL promoted heavily in its advertisements. The device design

CLASS ACTION COMPLAINT
CASE NO.

thus leads users to take in far more nicotine than they would with cigarettes.

54.     Each JUULpod delivers significantly more nicotine than a pack of cigarettes, both per pack and per puff.  JUUL's representation to the contrary is incorrect, and designed to induce purchases of its products.

### 2.    JUUL Deceived Consumers As to Actual Nicotine Content.

55.     From JUUL's pre-release announcements to the present, JUUL has continuously represented that each pod contains as much nicotine as a pack of cigarettes.  These claims, which JUUL has made widely in advertisements, in press releases, and on its website, have been repeated by reputable sources.

56.     JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength. JUULpods contain more than 5% nicotine by volume, and deliver it in a particularly potent form. JUUL's "5% strength" statement misrepresents the central feature of its product—nicotine content—and has misled consumers to their substantial detriment.  At least two independent studies that tested multiple varieties of JUULpods have found significantly higher concentrations of nicotine than JUUL's label represents.

### 3.    JUUL's "Switch" Campaign Falsely Advertised JUUL Devices as a Smoking Cessation Therapy.

57.     The JUUL vaping device has not been approved as a smoking cessation therapy or as a modified risk tobacco product.

58.     Through its "Switch" advertising campaign, JUUL urged cigarette smokers to switch to JUUL.  The Switch campaign urges people to switch on the basis that, unlike cigarettes, JUUL devices are harmless to your health.

59.     The Switch campaign suggests that smoking and JUULing are mutually exclusive and that buying and trying out a JUUL will convert a smoker to a non-smoker.

60.     In fact, as JUUL is aware, a large number of smokers who use JUUL products end up smoking *and* JUULing, worsening their addiction.

61.     By referring to cost-saving calculators, JUUL's switch campaign also presents its vaping devices as more affordable than cigarettes.  Those calculators assume that a smoker who switches to

CLASS ACTION COMPLAINT
CASE NO.

JUUL will continue consuming the same amount of nicotine as they did as a smoker (i.e., a pack a day smoker is presumed to consume one JUULpod a day). JUUL's calculator is misleading because, as JUUL is aware, smokers who switch to JUUL typically *increase* their nicotine intake or consume both cigarettes and JUUL products.

62.    The Switch campaign does not disclose or warn about the risks of multiple tobacco product use or the fact that JUUL is not a smoking cessation product.

>    **4.    JUUL Misleadingly Markets and Sells E-Cigarette Subscriptions With a "Cancel Anytime" Offer While Failing to Disclose the Products' Highly Addictive Nature.**

63.    JUUL offers "Autoship" subscription services that provide "pods at your door and savings in your pocket. 15% off every order. Cancel anytime." JUUL's "cancel anytime" message incorrectly implies that users also can quit anytime. Instead, most JUUL users become highly addicted to vaping.

64.    JUUL's "cancel anytime" representation is materially misleading. Even though consumers are not obligated to purchase additional JUULpods, JUUL fails to disclose that use of its products is likely to cause nicotine addiction, interfering with the user's ability to "cancel anytime." Many users instead purchase JUUL products in higher volumes to achieve the same "high" as their tolerance to nicotine increases.

65.    The highly addictive nature of JUUL's products also effectively extends and prolongs the economic injury to Plaintiff and class members, who, to avoid the adverse effects of nicotine withdrawal, are impelled to continue purchasing more JUULpods.

>    **C.    JUUL Deployed an Extensive Marketing Campaign Modeled on the Tobacco Industry's Earlier Campaign of Deceit.**

66.    JUUL has greatly increased its market share, revenue, and profits by marketing JUUL products to minors and young adults using the same or similar strategies deployed by cigarette companies in the 20th century. JUUL has relied heavily on social media and other viral advertising tools to hook people, especially minors, on its addictive e-cigarette products.

67.    JUUL adopted the same themes used by Philip Morris, RJR and other large tobacco

CLASS ACTION COMPLAINT
CASE NO.

companies in their extensive advertising campaign that glamorized cigarette smoking while

downplaying its addictiveness and harmful health consequences.

                **1.**      **Overview of Viral Marketing Campaigns and Online Marketing**

      68.    "Viral marketing" has been defined as "marketing techniques that seek to exploit

preexisting social networks to produce exponential increases in brand awareness, through processes

similar to the spread of an epidemic." Viral marketing is a form of word-of-mouth recommendation that

harnesses the network effect of the internet to rapidly reach a large number of people. Because the goal

in a viral marketing campaign is to turn customers into salespeople who repeat a company's

representations on its behalf, a successful viral marketing campaign may look like millions of

disconnected, grassroots communications, when in fact they are the result of carefully orchestrated

corporate advertising campaign.

      69.    Although companies may use different media to transmit their messaging, viral marketing

campaigns tend to share similar features, such as (1) a simple message—typically implied by an

image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social

media, to reach and engage the target audience; (3) use of content that invites participation and

engagement; and (4) use of third parties to magnify the impact of a message.

      70.    A viral marketing campaign typically begins with the advertiser's "push" of new content

on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform.

A company that wants to push an ad on social media platforms may solicit followers to its social media

pages, so that when the company posts to its feed, the content is delivered to those followers and to

those who visited the company page. The company also can buy paid advertisements for delivery to

specified target audiences and then, to amplify the message, rely on other means, such as paid

influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with

advertisements across social media.

      71.    Companies seeking to advertise new products or reach a new demographic also rely on

the "like" and "share" features of social media, which allow users to promote content to their own

audiences. With the advent of social media, viral marketing campaigns have become a particularly

effective way to reach young people, particularly teenagers. Teenagers tend to use social media far more

than adults, and tend to be more susceptible to peer pressure.

> **2.    The Tobacco Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products.**

72.    To remain profitable, the tobacco industry must continue to entice new customers.  Some existing customers wean themselves from addiction, while others eventually die, necessitating replacement customers to maintain profit streams.  In the early years of the 21st century, tobacco usage in the United States fell dramatically, with particularly large decreases in youth smoking rates.  Tobacco companies have worked to counteract these declines.  Historically, tobacco companies fought to increase share penetration among the 14-24 age group because young smokers have been the critical factor in the growth of tobacco companies.

73.    Because teenagers often are striving to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave among peers.  By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers.  In the 20th century, tobacco companies intentionally exploited adolescents' vulnerability to imagery with advertisements emphasizing independence, sophistication, glamour, sexual attractiveness, popularity, rebelliousness, and being "cool."

74.    Tobacco companies have also known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth Cigarette – New Concepts" observed that "it's a well known fact that teenagers like sweet products."  A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth.

> **3.    Tobacco Companies Are Prohibited from Using Viral Marketing Practices and Flavored Cigarettes.**

75.    Under the Master Settlement Agreement of 1998 (MSA), manufacturers agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising,

14

**CLASS ACTION COMPLAINT**
CASE NO.

promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." They also agreed to refrain in the United States from:

      a.    using outdoor advertising such as billboards,

      b.    sponsoring events,

      c.    giving free samples,

      d.    paying for placement of tobacco products in movies and television programs; and

      e.    paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

76.    In 2009, the FDA banned flavored cigarettes under its authority conferred by the Family Smoking Prevention and Tobacco Control Act of 2009. Then-FDA commissioner Dr. Margaret A. Hamburg explained that "flavored cigarettes are a gateway for many children and young adults to become regular smokers."

77.    The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

78.    A study of the cigarette flavor ban in 2017 found that the flavor ban was effective in lowering the number of smokers and the amount of cigarettes smoked by smokers, but also was associated with an increased use of menthol cigarettes. The same study reported that 85% of adolescents who use e-cigarettes use flavored varieties.

      **4.**    **JUUL's Marketing Relied on Banned Strategies Perfected by Tobacco Companies to Induce Young Non-Smokers to Purchase JUUL Products.**

79.    Since 2015, JUUL has been operating a viral marketing campaign aimed at teenagers and young adults and modeled on the strategies and themes successfully employed by cigarette companies in the 20th century.

80.    The imagery of JUUL's advertisements directly parallels the successful earlier cigarette advertisements, associating smoking or vaping with attractiveness, stylishness, sex appeal, fun,

"belonging," relaxation, sensory pleasure, and sweetness.

81.     Social media has enabled JUUL to carry out an even more pervasive and insidious viral marketing campaign than its tobacco industry predecessors.  JUUL developed and oversaw a long-term viral marketing campaign designed to induce minors to purchase its products.

82.     JUUL carried this campaign out by (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) employing third-party influencers to amplify its message around the internet; (v) employing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within the reach of youth.

83.     JUUL's advertisements consistently withheld material information about the dangers of the product.  Through its long-term advertising campaign, JUUL was able to persuade consumers—and in particular teenagers and young adults—that the product was cool while concealing the hazards of using it.  And because JUUL's marketing was viral, its promotions continue to reach youth even after JUUL deactivated its social media accounts.

     **i.**     **JUUL Advertising Used Imagery that Exploited the Psychological Vulnerabilities of Youth.**

84.     Throughout the class period, JUUL ran a consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of an adolescent's future self) while failing to disclose the products' true nature or risks.

85.     JUUL knew that to increase the chances of content going viral among teens, it needed to design a simple campaign that would generate an emotional response that would resonate with them while concealing that the product was unsafe and addictive.  Working with social media marketing company Cult Collective, JUUL designed a campaign that positioned its vaping device as a modern product that represented a better way of life for young people.  That campaign succeeded.

ii.    **JUUL's Launch Campaign Was Designed to Create Buzz Among Young Consumers.**

86.    To announce the JUUL's release in June 2015, JUUL launched a "Vaporized" advertising campaign that was aimed at a youth audience.  The campaign used young, stylish models, bold colors, and memorable imagery.  The models often used hand gestures or poses that mimicked the mannerisms of teenagers.

87.    The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties, and it highlighted themes of sexual attractiveness, independence, rebelliousness and being "cool."  Thus, the Vaporized campaign targeted youth using precisely the template relied on by its tobacco industry predecessors.

88.    The Vaporized ads often contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest generation of cool products, like iPhones and MacBooks.

89.    JUUL's campaign relied on a color scheme similar to the color scheme used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers, in its advertising.

90.    JUUL's Vaporized ads did not include any visible or prominent disclaimers about the dangers of nicotine.

91.    As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy that aligned perfectly with those we knew would be our best customers" (young adults).

92.    As part of the Vaporized campaign, JUUL advertised on a 12-panel display over Times Square.  Billboard advertising of cigarettes has for years been unlawful under the MSA, but that agreement's silence on vaping allowed JUUL to evade that prohibition that applies to other tobacco products.

93.    JUUL also ran the Vaporized campaign in Vice magazine, which bills itself as the "#1 youth media brand" and is known for its edgy content that appeals to youth.  JUUL also arranged for a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers.  These activities again

CLASS ACTION COMPLAINT
CASE NO.

would have run afoul of the MSA had JUUL been marketing a smoking rather than a vaping system for nicotine delivery.

94.    JUUL's chief marketing officer, Richard Mumby, noted "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product." JUUL's reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously cigarette smokers to buy and try out JUUL products, by making vaping the JUUL device seem like fun if somewhat illicit pleasure that was free from long-term negative consequences.

95.    JUUL promoted the Vaporized campaign on Facebook, Instagram, and Twitter. The Vaporized campaign included the largest ENDS smartphone campaign of 2015, accounting for 74% of all such smartphone advertising that year and generating over 400 unique promotions.

96.    JUUL also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada. The invitations to these events did not indicate that the JUUL contained nicotine or was addictive. Instead, the invitations relied on PAX's reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a longstanding tobacco industry practice, but is now forbidden.

97.    John Schachter, director of state communications for Campaign for Tobacco-Free Kids, expressed "concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."

98.    To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to miss.

### iii.    JUUL Gave Away Free Products to Get New Consumers Hooked.

99.    At its live social events, JUUL distributed free starter packs containing a JUUL and four JUULpods of varying flavors. This conduct is forbidden with respect to cigarettes under the MSA due to its role in bringing about dangerous addiction.

CLASS ACTION COMPLAINT
CASE NO.

100.    BeCore, one of the firms responsible for designing and implementing JUUL's live event, reported that "on average, BeCore exceeded the sampling goals set by JUUL . . . average number of samples/event distributed equals 5,000+."

101.    JUUL publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events. Still, JUUL continued to do so, sometimes through $1 "demo events."

102.    The intent and effect of JUUL's Vaporized giveaways was to flood major cities with free product which, because of its addictive nature, would hook tens of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media.

### iv.    JUUL Depicted Its Products as Being Status Symbols and Tailored the Form of Its Social Media Advertising to Appeal to Youth.

103.    To trigger a favorable emotional response and desire, JUUL's post-"Vaporized" advertisements continued to plant the image of JUUL e-cigarette vaping devices and JUULpods as being sleek, stylish status symbols.

104.    These advertisements conveyed to teenagers that JUUL was a product being used by cool, modern young people. JUUL, like other tobacco companies, knows that this is a powerful and effective marketing message.

105.    JUUL's online advertisements resonated with teenagers as they made JUUL, and especially the flavored pods, look like cool gadgets or software, something akin to an iPhone or a hot new app to download. In fact, JUUL consistently referred to its vaping device as "the iPhone of e-cigarettes," a statement JUUL posted on its website, distributed through social media, and disseminated through its email campaign. The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition. JUUL's advertising images frequently included pictures of iPhones and other Apple devices, including iPads, Beats Headphones, and MacBook laptops. Through these images, JUUL presented its device as a "must have" technology product and status symbol, instead of a nicotine delivery system.

106.    To maximize their impact and sharing among teens and young adults, JUUL crafted

CLASS ACTION COMPLAINT
CASE NO.

social media advertisements that used imagery instead of text and artful, eye-catching graphics.

107.    None of these ads prominently disclosed the dangers of using JUUL.  Where JUUL's advertisements contained such a disclaimer, this disclaimer was not typically seen when viewing social media because of how the posts appeared in phones and browsers.  Facebook and Instagram typically only show the image and a couple lines of text; users who want to see the entire post must click on it to open it up and read the rest.  JUUL's Instagram advertisements, for example, obscure their nicotine warnings by placing them in a location that required the user to open up the post and read it.  JUUL consistently used brief text at the beginning of a post so that it would appear to be a complete sentence with no further content.  As a result, nicotine disclaimers were never visible to anyone viewing the posts in their main feed, and were only seen by the small minority of people who actually opened the post to read it in full.  And on Twitter (geared towards reading text) and Facebook (where some users also read text,) JUUL typically did not include any disclaimer in its advertisements.

### v.    JUUL Used Flavors and Food Imagery to Attract Non-Smoking Teenagers and Adults.

108.    The tobacco industry has long known that sweetened cigarettes attract young smokers.  As discussed above, the FDA banned flavored cigarettes for that reason.

109.    JUUL sells its JUULpods in a variety of sweetened flavors.  It even advertised some of its flavors as if they were actually desserts—e.g., it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon."

110.    JUUL's advertising emphasized the flavors of its sweetened nicotine pods.  JUUL advertised JUULpods as part of a meal, to be paired with other foods.  In late 2015, JUUL began a food-based advertising campaign entitled "Save Room for JUUL."  A play on the expression, "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, adopting the conceit of pairing them with foods.  On Instagram and Twitter, JUUL boasted about a "featured" celebrity chef creating a "seasonal recipe to pair with our bruule pod."  In one 2016 marketing email, JUUL suggested that users satisfy their sugar cravings with JUUL's highly addictive nicotine vapor: "Have a sweet tooth? Try Brulee."  JUUL similarly promoted its fruit medley pods using images of ripe berries.  And JUUL described its "cool" mint pods as having a "crisp peppermint taste with a pleasant aftertaste."

111.    The use of flavors greatly increases e-cigarette adoption by underage "vapers." A national survey found that that 81% of youth aged 12-17 who had never previously used e-cigarettes used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users vaped a flavored e-cigarette during the past month. Additionally, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."

112.    The use of attractive flavors foreseeably increases the risk of nicotine addiction. Traditional cigarette product designs aimed at reducing the unpleasant qualities of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to drive up addiction rates. Adolescents whose first tobacco product was flavored also are more likely to continue using tobacco products than those whose first product was tobacco-flavored.

113.    JUUL's child-friendly flavors included mango and "cool" mint. These are JUUL's two most popular flavors among youth, and JUUL promoted them on Instagram, YouTube and other social media sites favored by young audiences. The 2018 Duell Study found 94 mg/mL nicotine in a JUUL "cool" mint pod—nearly double the amount that JUUL's "5% strength" label would suggest.

114.    Three-quarters of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod. More than half of teens in a nationwide survey by the *Wall Street Journal* stated that they use ENDS because they like the flavors.

115.    By presenting JUULpods as a delicious treat rather than a system for delivering a highly addictive drug, JUUL led consumers to conclude that JUULpods were harmless, or even a pleasure to be enjoyed regularly without guilt or adverse effect.

116.    At least as early as 2017, JUUL knew that a significant percentage of its customers consisted of adolescents who overwhelmingly preferred fruit medley and crème brulee over tobacco or menthol pods. *See* Truth Initiative, *JUUL fails to remove all of youth's favorite flavors from stores*, (Nov. 15, 2018). Instead of taking corrective action or withdrawing the sweet flavors, JUUL kept them on the market, resulting in more addicted youths.

117.    In November 2018, in response to litigation and other mounting public pressures, JUUL announced that it had "stopped accepting retail orders" for many of its flavored JUULpods, such as mango, crème brulee, and cucumber. But JUUL's promise is misleading. JUUL has only refused to sell

CLASS ACTION COMPLAINT
CASE NO.

these pods directly to retailers; it still manufactures and sells them. The pods also can be purchased on its website.  Moreover, JUUL continues to sell "cool" mint pods in gas stations, knowing that the flavor is very popular with youth.

118.    While JUUL maintains that it has strict age verification procedures on its website and limits purchases to users who are 21 and older, it continues to permit consumers to purchase up to 60 flavored JUULpods every month.  JUUL knows that its JUULpods are likely to end up in the hands of teenagers, including from resale "straw" transactions.

119.    JUUL represents that it uses state-of-the-art age verification for website purchases.  But its verification has not been effective or properly implemented—numerous underage purchasers have used JUUL's website to purchase products or obtain warranty service.

> ### vi.    JUUL Developed Point-of-Sale Advertising That Emphasized the Vaping Product's Positive Image Without Adequately Disclosing Its True Nature and Risks.

120.    The tobacco industry spends $8.6 billion a year in point-of-sale ("POS") promotions.  In a 2009 study of adult daily smokers, 22% of participants said they made unplanned cigarette purchases, and POS displays caused nearly four times as many unplanned purchases as planned purchases.  Younger smokers are even more likely to make unplanned tobacco purchases when confronted with POS advertising.

121.    Other studies have found that youth who were frequently exposed to POS tobacco marketing were twice as likely to try smoking than those who were not as frequently exposed.  Research also shows that young adult smokers prefer the tobacco brands marketed most heavily in the convenience store closest to their schools.

122.    Before launching the JUUL vaping device in 2015, JUUL and Cult Collective developed innovative packaging and creative store displays that would carry their marketing message into stores.  They designed bright white packages that resembled iPhone boxes, which JUUL knew would resonate with young people, and because it was solid white, the packaging stood out and caught people's attention when displayed on store shelves.  JUUL POS posters and signs also promoted JUUL's flavors.

123.    From 2015 through late 2018, JUUL promoted JUUL products and JUUL flavors at the

CLASS ACTION COMPLAINT
CASE NO.

point of sale without disclosing that the products contained nicotine or warning that the products may lead to addiction.  Instead, JUUL's promotions displayed the colorful JUULpod caps and their food-based names while omitting the central feature of the JUUL—it delivers nicotine.

> **5.   JUUL Used Social Media to Inundate Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products.**

124.   JUUL set out to advertise on at least three major social media platforms—Instagram, Facebook, and Twitter—and disseminated its advertisements in various ways across the platforms.

125.   As of 2016, 76% of American teens age 13-17 used Instagram, 66% used Facebook, and 44% used Twitter.  On these and other social networks, JUUL posted its advertisements directly to its own page, where it would be seen by those who followed JUUL and those who shared its posts.  JUUL also engaged in paid advertising, through which it targeted specific demographics to ensure they received its advertisements.

126.   Instagram was the centerpiece of JUUL's teen-focused advertising campaign.  Because of how Instagram delivers content, its platform allowed for fast, effective delivery and sharing of JUUL's graphic, simple messages.  Users saw these images simply by scrolling through their feeds.

127.   JUUL also disseminated unpaid advertising on social media by using hashtags, phrases preceded by a # that function to catalogue posts.  Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks.  On most social media platforms, users can find information by running a search for a hashtag with that key word.  Thus, people interested in JUUL could search for "#JUUL" to find posts that include that hashtag.  On Instagram, users can set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.  JUUL's hashtag marketing played a central role in the viral spread of JUUL use among teenagers.

128.   From 2015 through 2018, JUUL used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products.  In various posts, JUUL slipped in hashtags so that their posts would be found by young people.  For example, JUUL used #TBT, an acronym for "Throwback Thursday."  Throwback Thursday is a popular teenage meme on social media.  So, any teenager who had chosen to follow the hashtag TBT would see JUUL's post when they logged onto Instagram.  And no one would see the nicotine warning unless they actually opened the post, which

CLASS ACTION COMPLAINT
CASE NO.

seldom happened.  JUUL relied on numerous popular hashtags, including hashtags corresponding to its flavored nicotine pods.

129.    Social media platforms also permitted UUL to engage in micro-targeting, i.e., to choose precisely which demographics of people would be exposed to its advertising.  These platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power.  When advertisers pay for ads, they can choose to target them so that they are received only by those whose digital record suggests an interest in or predisposition to the product.  At a minimum, JUUL did not exclude teenagers from its targeted social media advertising.

130.    Paid advertising can be shared and liked, and JUUL relentlessly advertised to its target audience across all social media platforms.  JUUL's blanketing of paid advertisements on social media increased the pressure to buy its products.  JUUL's advertising also made quitting harder because those trying to quit were exposed to the advertising unless they chose to quit social media.

### 6.    JUUL Paid Third-Party Influencers and Affiliates to Amplify Its Message to Teens.

131.    To broaden the reach of its campaign, JUUL used "influencers" to push its products to young adults, particularly on Instagram.  People follow influencers because they tend to deliver high-quality, interesting photos and content, and because they are known to be trend-setters.

132.    JUUL relied on influencers to carry out its viral marketing campaign.  For example, Christina Zayas (@christinazayas on Instagram) is a Brooklyn-based influencer with over 57,700 followers, many of whom are under 18.  Zayas's Instagram feed and blog present her as a stylish young woman, who showcases fashionable clothing, makeup trends, and a hip urban lifestyle.  Zayas also lists herself as vegan, and includes "Spiritual Wellness" in her bio, and hence was a logical target for JUUL marketing teams looking to distance the company from the harms typically associated with smoking and convey to youth that its product was safe.  Under JUUL's direction, a marketing firm invited Zayas to join a JUUL campaign in September 2017, asking her to "try JUUL's premium e-cigarette and share your experience" with her many followers.  Zayas was paid $1,000 for one blog post and one Instagram post.  She reported that she wanted to talk about her struggle with addiction in her JUUL-promoted posts but was told instead to promote the positive characteristics of the JUUL.

133.    Like JUUL's own advertising on its own site, the Instagram post did not contain any information about the dangerous attributes of JUUL vaping and served to convince young people that that was what cool Brooklyn fashionistas were doing.  At least 1,509 people "liked" the post and 46 more commented on it.

134.    JUUL also used celebrities to promote JUUL use.  In 2016, JUUL's social media accounts promoted multiple images of pop star Katy Perry—who has a large youth audience—with a JUUL.  By including Perry's Twitter handle in its post, JUUL sought to introduce the JUUL, and Perry's apparent affinity for it, to Ms. Perry's 107,000,000 followers on Twitter.

135.    To further spread its message, JUUL also offered to influencers and bloggers the option to make more money by posting links to JUUL's website.  These initiatives served to encourage even more people to post and advertise about JUUL on the internet and social media, exposing even more teenagers to the campaign.

136.    JUUL's affiliates routinely failed to disclose or adequately disclose that the affiliate had a commercial relationship with JUUL and was being paid to promote JUUL products.  Many of the apparently user-generated advertisements that JUUL posted to its social media accounts depicted models or influencers being paid by JUUL without disclosure of the commercial relationship between JUUL and the model.  By presenting JUUL advertisements featuring compensated models as unsolicited "#JUULmoment" posts, JUUL led its target audience to believe that JUUL use was more widely used than it was, that attractive, popular people used JUUL, and that those same people endorsed creating and posting JUUL-related social media content on Instagram and other platforms.

137.    As discussed earlier, the MSA prohibits tobacco companies from using such affiliate and influencer ads.

**7.    JUUL Utilized a Pricing and Distribution Model Targeting the Youth Demographic.**

**i.    JUUL's Pricing Model Enticed New Nicotine Users, Including Youths and Non-Smokers.**

138.    Tobacco companies for years sold youth-brand cigarettes at lower prices that underage smokers could afford and relied on discounts and other promotions to ensnare underage smokers. Likewise, JUUL distributed and priced its products so as to ensnare youth.

CLASS ACTION COMPLAINT
CASE NO.

139.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13–$20.  JUUL's website charges $15.99 for a four-pack of JUULpods, or about $4 per JUULpod.  By contrast, a single pack of cigarettes in California costs approximately $8.

140.    JUUL also offers discounts to purchasers who refer others to purchase JUULpods or JUUL devices from JUUL, as well as to individuals who sign up for JUUL's subscription service.

### ii.    JUUL Distributed Its Products to Retail Locations That Its Target Audience Frequented, and Had the Products Displayed in Readily Accessible Locations.

141.    JUUL for years made it difficult for smoke shops, vape shops and other age-restricted stores to carry its products, instead distributing all or virtually all of its product to gas stations, which historically are the worst offenders with respect to underage sales.  JUUL knows that teenagers, those new to smoking, and those trying to quit their nicotine addiction are likely to visit gas stations and convenience stores rather than smoke shops.  Therefore, to increase sales to those people—its core targeted customers—JUUL focused its distribution efforts on gas stations and convenience stores.

142.    To further drive curiosity and interest, and increase JUUL purchases by its core targeted customers, JUUL directed retailers to display the product on display cases on store shelves, instead of behind the counter, where cigarettes and other tobacco products have long been kept.  JUUL also specifically designed the clear display cases so that the devices' bright white, sleek packaging and flavors would catch consumers' eyes and entice them to buy the product.

143.    JUUL knew, moreover, that by directing retailers to display JUUL products separately from other tobacco products, and within arms' reach of customers, they would think or assume that JUUL was safer than traditional cigarettes kept behind the counter.

144.    JUUL's retail locations provide no signs warning of addiction from or the amount of nicotine in JUUL products.

### 8.    JUUL's Conduct Has Created a Public Health Crisis.

145.    JUUL has grown faster than any other e-cigarette company in the United States and holds a majority of the U.S. e-cigarette market.  The JUUL delivers more nicotine in a shorter amount of time than any other product, in a sweetened vapor that causes no irritation, and through a concealable device

that can be vaped discretely in class, at home, and in the car. As a result, nicotine naïve users frequently spiral into deep addiction.

146.    With the JUUL now being a status symbol for teens, the acute addiction JUUL fosters is frequently reinforced by the notion—which JUUL spread—that JUUL use is what "cool" kids do in high school. The medical community has thus been ill-equipped to develop a treatment for JUUL-addicted youth.

147.    On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent ENDS vaping from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."

148.    The percentage of 12th graders who reported vaping nicotine nearly doubled between 2017 and 2018, from 11% to 21%. The ten-percentage-point increase is "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade." "One in five 12th graders vaped nicotine in the last 30 days in 2018."

149.    FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers. The rapid adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products," Gottlieb noted. He identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."

150.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks." The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

## CLASS ACTION ALLEGATIONS

151.    Plaintiff brings this lawsuit under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3) and/or (c)(4) as representatives of a class initially defined to include all persons who purchased a JUUL e-cigarette and nicotine pod(s) in the United States within the applicable statutes of limitations.

CLASS ACTION COMPLAINT
CASE NO.

Plaintiff also proposes a subclass of all persons who purchased a JUUL e-cigarette and nicotine pod(s) in the State of Hawaii within the applicable statutes of limitations (the "Hawaii class").

152.    **Numerosity.**  JUUL sold at least hundreds of thousands of the products at issue.  The class members are widely dispersed throughout the country and are so numerous that their joinder is impracticable.

153.    **Typicality.**  Plaintiff's claims are typical of the claims of all class members.  Plaintiff, like all class members, purchased a JUUL e-cigarette and nicotine pods.  Plaintiff and class members suffered economic harm from JUUL's common course of deceptive conduct and seek relief based on JUUL's misleading marketing and defective design of common e-cigarette vaping products.

154.    **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the class. He has no interests antagonistic to the interests of other class members and is committed to vigorously prosecuting this case.  Plaintiff has retained competent counsel experienced in the prosecution of consumer protection class actions involving misleading marketing and defective products.

155.    **Commonality and Predominance.**  Questions of law and fact common to the class members predominate over questions that may affect only individual class members, because JUUL has acted on grounds generally applicable to the class as a whole.  Questions of law and fact common to the class include:

a.    Whether JUUL's marketing of its e-cigarettes and nicotine pods was likely to deceive a reasonable consumer;

b.    Whether JUUL's marketing and sale of its e-cigarettes and nicotine pods was unscrupulous, oppressive, or substantially injurious;

c.    Whether JUUL is strictly liable based on its defective design of these products and/or failure to warn of their dangerous propensities;

d.    Whether JUUL was unjustly enriched by its marketing and sale of these products;

e.    Whether Plaintiff and class members are entitled to equitable relief, including restitution and injunctive relief; and

CLASS ACTION COMPLAINT
CASE NO.

f.    Whether Plaintiff and class members are entitled to damages or other monetary relief, and if so, in what amount.

156.    **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the amount of each individual class member's claim is small relative to the complexity of the litigation, and because of JUUL's financial resources, class members are not likely to pursue legal redress individually for the violations detailed in this complaint.  Individualized litigation would significantly increase the delay and expense to all parties and to the Court and would create the potential for inconsistent and contradictory rulings.  By contrast, a class action presents fewer management difficulties, allows claims to be heard which would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

157.    Class certification is also appropriate under Rules 23(b)(1), (b)(2) and/or (c)(4) because:

- The prosecution of separate actions by the individual members of the class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for JUUL;

- The prosecution of separate actions by individual class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

- JUUL acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the members of the class as a whole; and

- The claims of class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

CLASS ACTION COMPLAINT
CASE NO.

1

## **FIRST CLAIM FOR RELIEF**

2

### **Violations of Hawaii Law on Unfair or Deceptive Acts or Practices**
### **Haw. Rev. Stat. § 480-1 *et seq.***

3

4

158.    Plaintiff Brun hereby incorporates all other allegations set forth in this complaint.

5

159.    The Hawaii Statute on Unfair or Deceptive Acts or Practices, § 480-1, *et seq.* ("Hawaii

6

UDAP") sets forth that "[u]nfair methods of competition and unfair or deceptive acts or practices in the

7

conduct of any trade or commerce are unlawful."  Haw. Rev. Stat. Ann. § 480-2(a).

8

160.    Among other things, Section 481A-3(a) of the Hawaii UDAP defines actions that

9

constitute a "deceptive trade practice" as including, but not limited to, the following:

10

- § 481A-3(a)(5): Represents that goods or services have sponsorship, approval,

11

characteristics, ingredients, uses, benefits, or quantities that they do not have or that a

12

person has a sponsorship, approval, status, affiliation, or connection that the person does

13

not have;

14

- § 481A-3(a)(7): Represents that goods or services are of a particular standard, quality, or

15

grade, or that goods are of a particular style or model, if they are of another;

16

- § 481A-3(a)(9): Advertises goods or services with intent not to sell them as advertised;

17

- § 481A-3(a)(12): Engages in any other conduct which similarly creates a likelihood of

18

confusion or of misunderstanding.

19

161.    As alleged above, JUUL's conduct, including its labeling and promoting of its products fit

20

within the definitions and scope of the Hawaii UDAP.

21

162.    Plaintiff is a "consumer" as defined in Section 480-1 of the Hawaii UDAP, and as such,

22

he is authorized to bring this class-action claim under Sections 480-13(b) and 480-13.3(b) of the Hawaii

23

UDAP.

24

163.    JUUL's unfair or deceptive acts or practices described above constitute multiple, separate

25

violations of the UDAP.

26

164.    For example, JUUL engaged in unfair or deceptive acts or practices by knowingly

27

making numerous representations concerning its products that were false and misleading.

28

165.    JUUL also engaged in unfair or deceptive acts or practices by falsely representing its

products' nicotine content and their suitability as a nicotine cessation device despite knowing that JUUL devices have a propensity to aggravate cigarette and nicotine addiction.

166.    JUUL also engaged in unfair or deceptive acts or practices by falsely representing that one of its nicotine pods contains about as much nicotine as a pack of cigarettes when, in fact, one of its nicotine pods contains significantly more nicotine than a pack of cigarettes.

167.    JUUL also engaged in unfair or deceptive acts or practices by failing to disclose the actual facts regarding its products' high nicotine content and propensity to cause addiction and damage human health.  Those facts were material as they would be important to a reasonable consumer's decision whether to purchase and use these products.

168.    JUUL had a duty to disclose the true facts regarding its products' nicotine content and propensity to cause addiction and damage human health because JUUL possessed exclusive knowledge of these facts; because its products did not contain the qualities or characteristics, or perform, as advertised; because JUUL intentionally concealed these facts from Brun and Hawaii class members; and because JUUL made incomplete representations about its products while purposefully withholding material facts from Brun and Hawaii class members that qualified and contradicted these representations.

169.    JUUL's false and misleading representations and omissions were likely to mislead Hawaii consumers acting reasonably under the circumstances – including Brun – and were made by JUUL in connection with its promotion and sale of its products in its regular conduct of its trade or business within Hawaii, directly or indirectly affecting the people of the State of Hawaii.

170.    Those false and misleading representations and omissions were material because they involve information that would be important to consumers and, therefore, likely their conduct regarding JUUL products.

171.    Those false and misleading representations and omissions were unfair because they offend public policy and were immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers.

172.    JUUL knew or should have known at the time of making those representations or

31

omissions, or causing those representations or omissions to be made, that such representations or omissions were material and likely to mislead the public. In addition, JUUL knew or should have known that its marketing and promotional efforts were creating an untrue and misleading impression of the benefits and risks of JUUL products.

173.    In purchasing the JUUL products at issue, Brun and class members were exposed to, materially influenced by, and deceived by JUUL's materially misleading statements and omissions relating to these products.

174.    Brun and class members have suffered injury in fact and actual damages resulting from JUUL's materially misleading statements and omissions because they lost money when they purchased JUUL products or paid an inflated purchase price for those products.

175.    Under Section 480-13(b) and (c) of the Hawaii UDAP, Brun and class members seek threefold of the damages sustained, an order enjoining JUUL from further engaging in the unfair and deceptive acts and practices alleged herein, reasonable attorney's fees together with the costs of suit, and any other just and proper relief available under the Hawaii UDAP.

## SECOND CLAIM FOR RELIEF

### Strict Liability – Design Defect

176.    Plaintiff hereby incorporates all other allegations set forth in this complaint.

177.    Plaintiff asserts this claim on behalf of the class.

178.    JUUL developed, designed, engineered, manufactured, tested, marketed and sold the JUUL devices and JUUL pods, which were intended by JUUL to be used as a method of ingesting nicotine.

179.    JUUL knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use are extremely harmful, particularly to young adults and their developing brains.

180.    Nevertheless, as described herein, JUUL designed its products to appeal to non-smokers and young adults and to encourage them to buy and use the products, including by designing fruit- and candy-flavored JUUL pods, reducing throat hit, and by using youthful and flashy packaging.

CLASS ACTION COMPLAINT
CASE NO.

181.    JUUL's products as designed are unreasonably dangerous, particularly to young adults, and consequently are defective.

182.    When used in an intended or reasonably foreseeable way, JUUL's products are not as safe as an ordinary consumer would expect.  JUUL products contain and deliver significantly more nicotine than JUUL represents to the consuming public.

183.    Any benefits of JUUL's products are not outweighed by their risks, considering the gravity of the potential harm resulting from use of these products, the likelihood that the harm will occur, the feasibility of an alternative safer design at the time of manufacture, and the disadvantages of an alternative design.

184.    Plaintiff was unaware of the defective nature of the JUUL products before purchasing them.  At all relevant times, Plaintiff used JUUL's products as intended.

185.    Plaintiff and class members were harmed as a direct and proximate result of their purchases of JUUL products.  Based on the foregoing, JUUL is strictly liable for their injuries.

186.    By reason of the JUUL products' defective design, Plaintiff and class members sustained damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### Strict Liability – Failure to Warn

187.    Plaintiff hereby incorporates all other allegations set forth in this complaint.

188.    Plaintiff asserts this claim on behalf of the class.

189.    JUUL designed, manufactured, distributed and sold JUUL devices and JUUL pods.

190.    JUUL knew at all relevant times that the JUUL devices, when used in conjunction with JUUL pods, presented risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL pods.

191.    Use of JUUL devices and JUUL pods creates a substantial danger of nicotine exposure and addiction.  The risks to youths and adolescents are even greater.

192.    Plaintiff and class members were not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because JUUL intentionally downplayed, misrepresented,

CLASS ACTION COMPLAINT
CASE NO.

1    concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

2    193.    In all forms of advertising as well as social media communications, JUUL failed to

3    adequately warn or instruct foreseeable users, including youth and adolescent users, that JUUL products

4    were unreasonably dangerous to them and threatened hazardous nicotine exposure and addiction.  JUUL

5    failed to adequately warn in its advertising, in social media communications, or on product packaging

6    that the products were not safe for minors and should not be used by them.  Instead, as described herein,

7    JUUL deliberately marketed its products to minors, including by making them available in bright colors

8    and candy flavors.  JUUL also designed its products to be more palatable to youth and non-smokers by

9    reducing "throat hit" and increasing nicotine levels, making the products even more addictive.

10    194.    JUUL also failed to warn that its products were defective and did not conform to JUUL's

11    representations about JUUL pods' nicotine content and cigarette equivalence.  JUUL products contain

12    and deliver significantly more nicotine than JUUL represents.  JUUL pods contain 6.3% nicotine salt,

13    rather than the 5% JUUL advertised; JUUL pods deliver up to 52-72% more nicotine per puff than a

14    traditional cigarette; and the nicotine content of a single JUUL pod is approximately 24 cigarettes—at

15    least 20% more than a pack of cigarettes—contrary to JUUL's representation.

16    195.    The defects in JUUL products, including the lack of warnings, existed at the time the

17    JUUL pods and devices were sold and when the JUUL pods and devices left JUUL's possession.

18    196.    The JUUL devices and pods were expected to be used by Plaintiff and class members

19    without substantial change in their condition from the time of their manufacture or sale, and Plaintiff

20    used them as intended and without substantial change in their condition.

21    197.    Because it sold JUUL products to Plaintiff and class members when it already knew of

22    the products' defects and dangerous qualities, including through internal testing and published reports,

23    without warning of those defects and dangerous qualities, JUUL is strictly liable to Plaintiff and class

24    members.

25    198.    JUUL's failure to provide adequate instructions and warnings was a substantial factor in

26    inducing the purchases by Plaintiff and class members.  It was foreseeable to JUUL that its failure to

27    adequately warn about the risks of its e-cigarette products would damage and injure Plaintiff and class

28    members.

CLASS ACTION COMPLAINT
CASE NO.

199.    Thus, Plaintiff and class members are entitled to damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

200.    Plaintiff hereby incorporates all other allegations set forth in this complaint.

201.    Plaintiff asserts this claim on behalf of the class.

202.    As the intended and expected result of its wrongdoing, JUUL has unfairly profited and benefited from Plaintiff's and class members' purchases of its e-cigarette vaping products.

203.    JUUL voluntarily accepted and retained these profits and benefits with full knowledge and awareness that, as a result of JUUL's misconduct alleged herein, Plaintiff and class members were deceived about the true, hazardous characteristics of its e-cigarette vaping products.  JUUL acted with conscious disregard for the health and rights of Plaintiff and class members.

204.    JUUL has been unjustly enriched by its unconscionable, fraudulent, deceptive, and otherwise unlawful conduct in connection with the marketing and sale of its e-cigarette vaping products.

205.    Equity and good conscience militate against permitting JUUL to retain these profits and benefits.  JUUL should be required to make restitution to Plaintiff and class members of its ill-gotten gains from the conduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a Judgment:

A.    Certifying the class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff as class representative and the undersigned as class counsel;

B.    Entering appropriate classwide injunctive relief;

C.    Awarding damages including, without limitation, compensatory, restitutionary, statutory, and/or punitive damages;

D.    Awarding prejudgment and postjudgment interest as permitted by law;

E.    Awarding reasonable attorneys' fees and litigation expenses as provided by law; and

F.    Ordering such further and other relief as the Court may deem just and proper.

CLASS ACTION COMPLAINT
CASE NO.

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff demands a trial by jury on all issues so triable.

3

4    Dated:  January 2, 2020                    Respectfully submitted,

5

6                                              By:    */s/ Roberta D. Liebenberg*
                                               Roberta D. Liebenberg (*pro hac vice* forthcoming)
7                                              Gerard A. Dever (*pro hac vice* forthcoming)
                                               Ria C. Momblanco (*pro hac vice* forthcoming)
8                                              FINE, KAPLAN AND BLACK, R.P.C.
                                               One South Broad Street, Suite 2300
9                                              Philadelphia, PA  19107
                                               Telephone:  (215) 567-6565
10                                             Facsimile:   (215) 568-5872
                                               rliebenberg@finekaplan.com
11                                             gdever@finekaplan.com
                                               rmomblanco@finekaplan.com
12

13                                             *Attorneys for Plaintiff*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT
CASE NO.